**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| SCOTT RICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-5524 |
| | ) | |
| THOMAS J. DART in his official capacity as | ) | Hon. Charles P. Kocoras |
| Sheriff of Cook County, Illinois; | ) | |
| THE COOK COUNTY SHERIFF'S | ) | |
| MERIT BOARD; and COOK COUNTY, | ) | |
| ILLINOIS, as indemnitor, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

NOW COMES SCOTT RICE ("Plaintiff" or "Rice"), by and through his attorneys,

respectfully submit their Response to Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiff's

First Amended Complaint ("FAC"). For the reasons stated herein, Defendants' motion should be

denied in its entirety.

**LEGAL STANDARD – Fed. R. Civ. P. 12 (b) (6)**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the

sufficiency of the complaint, not the merits of the case. *See Gibson v. City of Chicago*, 910 F.2d

1510, 1520 (7th Cir. 1990). The plaintiff need not allege all the facts involved in a claim and can

plead conclusions. *Higgs v. Carter*, 286 F.3d 437, 439 (7th Cir. 2002); Kyle, 144 F.3d at 455. A

pleading need only convey enough information that the defendant is able to understand the

gravamen of the complaint. *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 184 F.3d 623,

627 (7th Cir. 1999). However, any conclusions pled must "provide the defendant with at least

minimal notice of the claim." *Kyle,* 144 F.3d at 455. Further, Rule 12(b)(6) speaks of the

1

dismissal of claims, not legal theories. A claim is a collection of facts that could entitle the plaintiff to relief under some legal theory. But plaintiffs are not required to identify in the complaint the legal theory, or theories, on which they wish to proceed; the complaint need only set forth "a short and plain statement of the claim showing that the pleader is entitled to. Fed.R.Civ.P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). (Complaint gives defendant "fair notice of the way the * * * claim is and the grounds upon which it rests."). A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." *Id.* at 46–47, 78 S.Ct. at 102–103. *See also Means v. City of Chicago*, 535 F.Supp. 455, 458–60 (N.D.Ill.1982) (applying the *Conley* standard to *Monell* claims), questioned in *Strauss*, 760 F.2d at 769–70. Even if such allegations may be hard to support with solid evidence, Plaintiffs are not required to submit evidence at the pleading stage of litigation. See *Gibson v. City of Chicago,* 910 F.2d 1510, 1522 (7th Cir.1990).

In considering the Defendants' motion to dismiss, the Court accepts the facts in the Plaintiff's FAC as true, *see O'Boyle v. Real Time Resolutions, Inc.,* 910 F.3d 338, 342 (7th Cir. 2018). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Twombly*, 550 U.S. at 563.

## ARGUMENT

**I.      The CCSO Policies Referenced in Plaintiff's FAC Discriminate on the Basis of Race and National Origin.**

The CCSO Policies, as referenced in Plaintiff's FAC, include the following:

- Cook County Sheriff's Order 11.2.20.0 (eff. Jan. 25, 2013), titled "Rules of Conduct," *See* Dckt. 19-2;

2

- Cook County Sheriff's Order 11.2.20.1 (eff. Mar. 12, 2015), *See* Dckt. 19-3;

- Cook County Department of Corrections General Order 3.8 (eff. Oct. 1, 1998), *See* Dckt. 19-4;

- Rules and Regulations of the Cook County Sheriff's Merit Board (Jan. 2012), *See* Dckt. 19-5; and

- Rules and Regulations of the Cook County Sheriff's Merit Board (Oct. 15, 2015), *See* Dckt. 19-6.

Overall, these CCSO policies at issue ("cited CCSO Policies") are discriminatory as applied to Plaintiff based upon his race (Black) and National Origin (Englewood in Chicago, Illinois).

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer, "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (2012). A plaintiff alleging intentional discrimination under Title VII may prove discrimination using either the direct method, by proffering direct or circumstantial evidence that discrimination motivated the adverse employment decision, or the indirect, burden-shifting method. *Andonissamy v. Hewlett–Packard Co.*, 547 F.3d 841, 849–50 (7th Cir.2008). To establish the prima facie case, a plaintiff must raise a genuine issue of material facts for each element. *DeLuca v. Winer Indus., Inc., 53 F.3d 793, 798* (7th Cir.1995). Once the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to articulate a non-discriminatory reason for the adverse employment action. *Sun v. Bd. of Trs. of the Univ. of Ill., 473 F.3d 799, 814* (7th Cir.2007). If the defendant does so, the burden shifts back to the plaintiff to submit evidence demonstrating that the defendant's explanation is pretextual. *Keeton v. Morningstar, Inc., 667 F.3d 877, 884* (7th Cir.2012).

In this case, Defendants claim that these cited CCSO policies are neutral and do not discriminate against Plaintiff on the basis of either suspect classification alleged in the FAC– race or national origin. Rather, Defendants claim that these policies exist "to set forth basic rules of conduct for sworn officers to protect those that the Office is charged with protecting as a matter of safety, and so that the citizens of Cook County have confidence in the Office of the Sheriff of Cook County and the Cook County Department of Corrections." *See* Dckt. 19, 5. Furthermore, Defendants claim that "a correctional officer seen interacting with known felons and known gang members while off duty gives the appearance to the community that the officer is not scrupulous, at best, and at worst, the officer could be on the take or could be involved with a criminal enterprise both outside and inside the correction facilities." *See* Dckt. 19, 6.

However, while Defendants' argument offers a non-discriminatory reason, that explanation is wholly pre-textual. Plaintiff Rice was never cited with engaging in any actual criminal activity in this matter, apart from mere association with individuals from his youth. As Defendants' argument points to safety as the underlined basis for legitimizing these policies, it assumes that every, single interaction between those in law enforcement, such as Plaintiff, and those with even *suspected* gang affiliation is rooted in illegal, criminal activity. Furthermore, it assumes that mere association between those in law enforcement, such as Plaintiff, and those with even *suspected* gang affiliation, will jeopardize the "security of CCSO facilities …or the health, safety and welfare of subjects, employees, visitors or the public." *See* Dckt. 19, 5.

Lastly, Defendants claim that "it is now more important than ever for the Sheriff's Office to establish to the citizens of Cook County that it employs officers who are above reproach." *Id.* However, in making that argument, Defendants fail to understand the actual and real crisis between sworn officers and disenfranchised communities today, such as Englewood. It fails to

4

take into consideration the great disparity in terms of hiring Blacks for law enforcement

positions today and the resulting gap that must be bridged in order to effectuate greater equity in

hiring practices in law enforcement. The direct effect of hiring more Blacks from

disenfranchised communities, like Englewood in Chicago, will likely increase the public trust in

law enforcement as a whole and thwart the disproportionate rate of gang violence that has

ravished so many communities across the nation. [1]According to a January 3, 2022 *Chicago*

*Tribune* article, "Chicago endured one of its deadliest years in at least the last quarter-century in

2021," according to Chicago Police Department data, information from other law enforcement

and the Cook County medical examiner's office. Including shootings on Chicago expressways,

there were at least 800 homicides in 2021. According to the medical examiner, "Blacks were the

victims of 80% of the homicides handled by the office. More than 1,000 homicides here were

gun-related," the office said. "Males accounted for 88% of homicide deaths… Eighty-six

homicide deaths were under 18; 12 were under the age of 10."

**II.     The Englewood Neighborhood in Chicago meets the EEOC's Interpretation
of "Place of Origin" and Maintains Nationally Recognized "Cultural
Characteristics" so Should Be Deemed Proper in Establishing "National
Origin" Discrimination for purposes of the Title VII framework.**

The Equal Employment Opportunity Commission has issued guidelines "broadly"

interpreting national origin to include ancestry, place of origin, and the cultural and linguistic

characteristics of a national origin group. 29 C.F.R. § 1606.1. Courts and the Code of Federal

Regulations have declared that, … "the regulations implementing Title VII provide that

discrimination on the basis of one's ancestor's "place of origin"—not nation of origin—is

---

[1] See: https://www.chicagotribune.com/news/criminal-justice/ct-2021-homicides-final-20220103-lrpzuh5nsjhspmos3edrzxu2ei-story.html

5

sufficient to come within the scope of the statute." 29 C.F.R. § 1606.1.5. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88, (1973). Notably, in *Janko v. Illinois State Toll Highway Authority,* 704 F.Supp. 1531 (N.D. Ill. 1989), the Court held that an individual's Romani ancestry and claim of being labeled a "Gypsy" in the course of her employment was sufficient to establish "national origin" discrimination. While Defendants made the claim that Plaintiff Janko failed to define "Gypsy" as being related to some particular country or region, the Court did not agree. *Id.*

"It has been steadfastly recognized by the Supreme Court that the purpose of this [2]statute was to prevent the majority people from discriminating against other people based upon ethnic distinctions commonly recognized at the time of the discrimination." *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 2026–29 (1987). "Congress intended to protect from discrimination identifiable classes of people who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended section 1986 to forbid, whether or not it would be classified as racial in terms of modern scientific theory." *Janko v. Illinois State Toll Highway Auth.,* 704 F. Supp. 1531, 1532 (N.D. Ill. 1989); *Abdullahi v. Prada USA Corp.,* 520 F.3d 710, 712 (7th Cir. 2008).

In this case, based on Englewood's nationally recognized cultural characteristics including skyrocketing gun violence statistics, lack of access to jobs for Englewood's residents and overwhelming housing and healthcare disparities, the Englewood neighborhood in Chicago that Plaintiff Rice cites in his FAC should be deemed proper in establishing "national origin" for

---

[2] 42 U.S.C.A. § 2000e-2

purposes of the Title VII framework. In following the *Janko* analysis, in allowing "place of origin" to fall under the definition of national origin, Englewood or any neighborhood that experiences systemic oppression or discrimination due to racial demographics or poverty on such a heightened level, could fall under this definition. Overall, the legitimacy of the assertion that the scope of national origin is expansive, including ancestry, ethnicity, non-sovereign countries, and thus likely could include the particular neighborhood one hails from, particularly if people from that place experience discrimination due to their place of origin, such as Plaintiff.

As a result, the Englewood neighborhood in Chicago meets the EEOC's interpretation of "Place of Origin" and maintains nationally recognized "Cultural Characteristics" so should be deemed proper in establishing a claim for "National Origin" discrimination for purposes of the Title VII framework.

**III.    The CCSO Policies Referenced in Plaintiff's FAC Discriminate against Blacks and Lack a Rational Basis – Establishing a Violation of Equal Protection and a Valid *Monell* Claim, thereby precluding Dismissal of Count II.**

Defendants argue that Plaintiff's *Monell* claim in Count II requires dismissal as Plaintiff cannot state a claim for an Equal Protection violation, the cited CCSO Policies at issue do not discriminate on the basis of any suspect classification and those same CCSO Policies survive a rational basis review. Dkt. 19, p.7.

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Often an equal protection violation occurs when a regulation draws distinctions among people based on a person's membership in a "suspect" class. *Martin v. Shawano–Gresham Sch. Dist.,* 295 F.3d 701, 712 (7th Cir.2002). Suspect classes include race, alienage, and national origin. *Vision Church v. Vill. of Long Grove,* 468 F.3d 975, 1000 (7th Cir.2006).

7

Another typical equal protection challenge is based on denial of a fundamental right. *Id.* Fundamental rights include freedom of speech and religion. *Id.* With both suspect classes and denials of fundamental rights, the government's justification for the regulation must satisfy the strict scrutiny test to pass muster under the Equal Protection Clause. *Id. Srail v. Vill. of Lisle, Ill.,* 588 F.3d 940, 943 (7th Cir. 2009).

In the absence of deprivation of a fundamental right or the existence of a suspect class, the proper standard of review is rational basis. *Vision Church,* 468 F.3d at 1000–01. Rational basis review requires the plaintiff to prove that (1) the state actor intentionally treated plaintiffs differently from others similarly situated; (2) this difference in treatment was caused by the plaintiffs' membership in the class to which they belong; and (3) this different treatment was not rationally related to a legitimate state interest. *Smith v. City of Chicago,* 457 F.3d 643, 650–51 (7th Cir.2006). *Srail v. Vill. of Lisle, Ill.,* 588 F.3d 940, 943 (7th Cir. 2009).

"*Monell* liability is not a form of *respondeat superior*; instead, a municipality can only be held liable 'when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible for under section 1983.'" *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 694 (1978). *Valentino v. Vill. of South Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009). "It is well-established that when a particular course of action is directed by those who set municipal policy, the municipality is responsible under section 1983, even if the action in question is undertaken only once. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)." "The determination of whether a person has policymaking authority is a question of state law, and is to be decided by the court. *Id.; Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Kujawski*

8

*v. Bd. of Comm'rs of Bartholomew County, Ind.,* 183 F.3d 734, 737 (7th Cir.1999). Our inquiry is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker "in a particular area, or on a particular issue. . .". *Kujawski,* 183 F.3d at 738 (citing *McMillian v. Monroe County,* 520 U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)). Officials with *final* decision-making authority are deemed policymakers for *Monell* purposes, and we need to look to state law to determine the scope of such authority. *See Pembaur,* 475 U.S. at 480, 106 S.Ct. 1292; *City of St. Louis v. Parroting,* 485 U.S. 112, 134, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Jett,* 491 U.S. at 737, 109 S.Ct. 2702.

"Helpful in determining whether an official is a final decisionmaker is an inquiry into: (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) "whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Randle v. City of Aurora,* 69 F.3d 441, 448 (10th Cir.1995) (citing *Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915). Also helpful is an examination of not only "positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law." *Mandel v. Doe,* 888 F.2d 783, 793 (11th Cir.1989) (finding that custom dictated that physician's assistant, and not supervising doctor, had final policymaking authority with respect to medical decisions made at road prison) (citing *Jett,* 491 U.S. at 722, 109 S.Ct. 2702); *Kujawski,* 183 F.3d at 737 ("Customary practices having the force of law may be considered as proof of delegation.").

Here, the express policies cited in the Merit Board's termination decision served as the basis or driving force behind Plaintiff's discharge, and the way they were applied to Plaintiff was mechanical and resulted in race/national original discrimination merely by virtue of where he

was from: Englewood. (Dkt. 1-4, ¶53). As noted in the Complaint, non-Black/white officers not from Englewood are not at the same disadvantage by these policies because, for example, an officer who grew up in Naperville, Illinois is less likely to suffer the consequences of this policy than Plaintiff. (Dkt. 1-4, ¶55). This is a long way of saying a very basic argument: Officers such as Plaintiff who grew up in Englewood in the 1980's and 1990's are obviously going to know folks who were in gangs. It is the essence of Plaintiff's Equal Protection complaint here that applying a policy to him about prohibited associations, without any evidence whatsoever of gang or criminal activity, is just a foil for discrimination because of his race and/or national origin. Of course, there could be officers who associate with gangs and criminals ***and*** who engage in criminal activity who are from Englewood or Naperville, and those officers would rightfully be fired. But Plaintiff, here, is saying that he was fired, virtually, for the mere fact that he grew up in Englewood and knows people there from his childhood. That is a race discriminatory outcome in his case as it is imposing a burden on officers who hail from Englewood that it does not pose on officers who hail from Naperville. This is Plaintiff's Equal Protection claim at its heart, and he has pleaded enough for it to move forward at the pleading stage.

Furthermore, even if the Court employed a rational basis review in this case, it can be argued that Defendants' stated purpose in promoting safety is not rationally related to a legitimate state interest. Rather, it further perpetuates the "us versus them" mentality and encourages a great divide between law enforcement and individuals from these disenfranchised communities that are ravished by violent crime, such as Englewood. If these barriers such as the cited CCSO Policies at issue did not exist, it can be argued that members of these disenfranchised communities, such as Blacks from Englewood, would be less likely to join gangs and less likely to engage in violent, criminal behavior that continues to plague cities like Chicago

10

today. By being allowed to associate with a member of law enforcement that also came from the same disenfranchised neighborhood -- troubled youth and other individuals from those same neighborhoods who are contemplating options for a life outside of crime -- will be influenced to a greater degree to choose a plausible pathway to a better life, including seeking out and applying for jobs in law enforcement, as compared to those who do not have any means of association or mentorship with a member of law enforcement. The direct effect of hiring more Blacks from disenfranchised communities into law enforcement will then significantly increase the public trust in law enforcement in those disenfranchised communities and drive down the disproportionate rate of gang violence that has ravished those same communities, such as Englewood today.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that this Court deny Defendants' Motion in its entirety. If the Court should decide to grant any portion of Defendants' Motion to Dismiss, Plaintiff requests leave to amend.

Respectfully submitted,

By: /s/ Nicollette M. Haines_____

Nicollette M. Haines
One of Plaintiff's Counsel

Nicollette M. Haines, Esq.
DISPARTI LAW GROUP, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 334
F: (312) 846-6363
E: Nicollette@dispartilaw.com

## CERTIFICATE OF
## SERVICE

The undersigned counsel certifies that she served the foregoing document on all counsel of record via this Court's CM/ECF filing system on January 27, 2022, and that all such counsels are registered e-filers.

*/s/ Nicollette M. Haines*

By:_____
