UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCOTT RICE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 21 C 5524 |
| ) | |
| THOMAS J. DART in his official capacity ) | |
| as Sheriff of Cook County, Illinois; THE ) | |
| COOK COUNTY SHERIFF'S MERIT ) | |
| BOARD; and COOK COUNTY, ILLINOIS, ) | |
| as indemnitor, ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court are two Motions: Defendants Thomas Dart, in his official capacity as Sheriff of Cook County, Illinois, and Cook County's (collectively, the "County Defendants") Motion to Dismiss Plaintiff Scott Rice's Complaint under Federal Rule of Civil Procedure Rule 12(b)(6); and Defendant Cook County Sheriff's Merit Board's ("Merit Board") Motion to Dismiss Plaintiff's Complaint under Rule 12(b)(6).[1] For the following reasons, the Court grants both Motions.

## BACKGROUND

For the purposes of these Motions, the Court accepts as true the following facts from the First Amended Complaint ("Complaint"). *Alam v. Miller Brewing Co.*, 709

---

[1] The Merit Board also joins in the County Defendants' Motion. *See* Dkt. ## 20, 26, 27.

F.3d 662, 665–66 (7th Cir. 2013). All reasonable inferences are drawn in Rice's favor. *League of Women Voters of Chi. v. City of Chi.*, 757 F.3d 722, 724 (7th Cir. 2014).

Rice was born in the Englewood neighborhood of Chicago, Illinois. He was hired as a Correctional Officer with the Cook County Department of Corrections ("CCDOC") on November 13, 2006 and served in that role until his dismissal on March 4, 2021. Throughout his employment as a Correctional Officer, Rice maintained relationships with individuals he had known since his youth who have been affiliated with gangs and have previous felony convictions. These individuals included Ronald Webb, Michael Hopkins, Brandon Armour, and Dante Mason.

The Cook County Sheriff's Office ("Sheriff's Office"), the Merit Board, and the CCDOC have numerous policies prohibiting interactions between officers and convicted felons and known gang members. Those policies are found in the Sheriff's Office Orders and Rules of Conduct, the CCDOC General Orders, and the Merit Board Rules and Regulations. The Merit Board's decision details a number of incidents of Rice's contact and associations with known gang members and convicted felons over the course of his employment. According to the Merit Board, these documented interactions violated several policies, ultimately leading to Rice's termination on March 4, 2021.

Based on these events, Rice filed a Complaint for administrative review and also brought claims alleging a violation of the Fourteenth Amendment's Equal Protection Clause based on race under 42 U.S.C. § 1983; a violation of Title VII for intentional

2

discrimination based on race and national origin; and a violation of Title VII for disparate impact discrimination based on race and national origin. The subject policies, as referenced in Rice's Complaint, include the following: (1) Cook County Sheriff's Order 11.2.20.0, titled "Rules of Conduct"; (2) Cook County Sheriff's Order 11.2.20.1; (3) CCDOC General Order 3.8; and (4) Merit Board Rules and Regulations.

The County Defendants, joined by the Merit Board, move to dismiss Counts II through IV of Rice's Complaint under Rule 12(b)(6). The Merit Board separately moves to dismiss Counts II through IV against it under Rule 12(b)(6).

## **LEGAL STANDARD**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in the complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need not provide detailed factual allegations, but it must provide enough factual support to raise its right to relief above a speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A claim must be facially plausible, meaning that the pleadings must "allow . . . the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496

F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

## DISCUSSION

With the above standards in mind, we address Defendants' Motions in turn.

### I.     The County Defendants' Motion to Dismiss

The County Defendants argue Count II of the Complaint must be dismissed because the policy or policies in question are facially neutral, apply to all Sheriff's Office employees, and are rationally related to legitimate state interests. The County Defendants also move to strike the allegations of national origin discrimination in Counts II through IV. We begin with the allegations of national origin discrimination.

#### A. National Origin Discrimination

Rice's Equal Protection and Title VII claims stem from Rice's claim he was subjected to intentional discrimination or disparate impact discrimination based on his race and national origin. Rice pleads that "the Sheriff, through the Board, committed intentional discrimination against Plaintiff based upon his race (Black) and National Origin (Englewood, Illinois) by applying the gang affiliation and other general orders against him," as those who grow up in areas such as Englewood, due to "higher rates of policing" and "higher rates of arrest, indictments, and convictions," are more likely to have associations with persons with criminal backgrounds than individuals who grow up in areas with lower rates of policing and arrest, indictment, and conviction rates,

4

specifically "white or wealthier neighborhoods." Thus, Rice claims that his national origin—that is, being from Englewood, Chicago, Illinois—has led to violations of the Equal Protection Clause and Title VII. Rice does not contend that this national origin claim comes from any other nation, but rather domestically.

The Supreme Court held that the term "national origin" and "ancestry" have similar meanings in this statute, meaning "the country from which you or your forebears came." *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 89 (1973). Rice argues that the national origin prong of the statute is intended to be interpreted broadly, where the Supreme Court has recognized that "Congress intended to protect from discrimination identifiable classes of persons who are subject to intentional discrimination solely because of their ancestry or ethic characteristics." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). However, the facts in this case differ from those in *Saint Francis*, as the individual who was discriminated against in *Saint Francis* had a national origin in Iraq, while Rice's claimed national origin is from Englewood, Chicago, Illinois.

Similarly, Rice contends that the framework set by the trial court in *Janko v. Illinois State Toll Highway Authority* allows him to pursue a claim of national origin based on Englewood. 704 F. Supp. 1531 (N.D. Ill. 1989). In *Janko*, the plaintiff alleged she was discriminated against by the Illinois State Toll Highway Authority due to her national origin of "Gypsy." *Id.* The *Janko* court noted the term "Gypsy" refers to "various ethnic groups not originally from this land because of ties to earlier nomadic

5

minority tribal peoples in the Caucasias." *Id.* at 1532. The court concluded that persons of "Gypsy" descent fit within the definition of national origin—even if the term "Gypsy" is not related to some particular nation or region—because Congress intended Title VII to prevent discrimination against people "based upon ethnic distinctions commonly recognized at the time of discrimination." *Id.*

Contrary to Rice's contention, the *Janko* framework would not support his allegations of national origin discrimination because he is from Englewood. Englewood, despite its unique characteristics, is "from this land." The Court therefore strikes all references to national origin discrimination in the Complaint. Because the County Defendants do not argue for dismissal of Rice's claims pertaining to race-based discrimination in Counts III and IV, those claims may proceed.

### B. *Monell* Claim

The Equal Protection Clause requires that "all persons similarly situated should be treated alike." *Lawrence v. Texas*, 539 U.S. 558, 579 (2003). Local governments can be held liable under Section 1983 for constitutional rights violations that arise out of matters of official policy. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 701 (1978). To prevail on an equal protection claim, a plaintiff must establish not only that the defendant's actions had a "discriminatory effect," but also that the defendant was "motivated by a discriminatory purpose." *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017).

To state a *Monell* claim for an equal protection violation, therefore, Rice must plead "'factual content that allows the court to draw the reasonable inference' that the [defendant] maintained a policy, custom, or practice of intentional discrimination against a class of persons to which [Rice] belonged." *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Rice must ultimately prove "that his constitutional injury was caused by (1) the enforcement of an express policy of the [public entity], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Wragg v. Vill. of Thorton,* 604 F.3d 464, 467–68 (7th Cir. 2010).

Here, while Rice generally references applicable law as it relates to official policymakers, in the Court's view, the focus of his Complaint and his primary arguments for his *Monell* claim relate to express policies.[2] Rice pleads that the express policies his termination was based upon are discriminatory based on his race. Rice alleges he "has suffered a deprivation of Equal Protection by the Sheriff and the Board, *to wit,* he comes from a poor background in Englewood and is Black." Thus, Rice contends the policies set out by Defendants are not facially neutral and are discriminatory, in violation of the Fourteenth Amendment. Defendants disagree.

---

[2] Indeed, Rice argues in his Response that "the express policies cited in the Merit Board's termination decision served as the basis or diving force behind Plaintiff's discharge, and the way they were applied to Plaintiff was mechanical and resulted in race/national origin discrimination merely by virtue of where he was from: Englewood." Dkt. # 24, at 9–10.

In *New York City Transit Authority v. Beazer*, the Supreme Court held that a government agency's refusal to employ persons who used methadone did not violate the Equal Protection Clause. 440 U.S. 568, 594 (1979). The New York Transit Authority had an anti-drug policy, which applied to all employees. *Id.* at 568. Although the majority of employees suspected of violating this policy were Black or Hispanic, the Court held that the policy was facially neutral, as these were "general rules that apply evenhandedly to all persons within the jurisdiction." *Id.* at 569, 587; *see also Calderone v. City of Chi.*, 979 F.3d 1156, 1163–65 (7th Cir. 2020) (affirming the trial court's motion to dismiss a city employee's *Monell* claim, as the policy was facially neutral).

The policies Rice purportedly violated include the following:

- "[CCSO employees shall] maintain a professional demeanor while on duty and will not engage in off-duty behavior that would reflect negatively on the CCSO." (Dkt. # 19-2, § VI(B)(1)).

- "[CCSO employees shall] conduct themselves on and off-duty in such a manner to reflect favorably on the CCSO. Employees, whether on or off-duty, will not engage in conduct which discredits the integrity of the CCSO, its employees, the employee him/herself, or which impairs the operations of the CCSO." (Dkt. # 19-2, § VI(B)(2)).

- "[CCSO employees shall] maintain a level of conduct in their personal and business affairs that is in keeping with the highest standards of the law enforcement profession. Employees will not participate in any incident that . . . causes the CCSO to be brought into disrepute." (Dkt. # 19-2, § VI(B)(4)(b)).

- "[CCSO employees shall not] engage in regular or continuous associations or dealings with persons whom they know, or should know, are persons who are: (a) Under criminal investigation or indictment; and/or (b) who have a

8

reputation in the community or the department for present or past involvement in felonious or criminal behavior." (Dkt. # 19-2, § VI(D)(9)).

- "It shall be the responsibility of every employee to immediately report to OPR and his/her immediate supervisor (or a supervisor of his/her choice within his/her Chain of Command) verbally and in writing, any fact or situation which may give rise to or be construed as corrupt, illegal, or unethical behavior, and/or a possible conflict of interest." (Dkt. # 19-2, § VI(H)(2)).

- "[Conduct which may result in discipline includes but is not limited to the following:] the substantiated, active, continuing association on a personal rather than official basis with a person or persons who engage in or are continuing to engage in violations of state or federal laws, where the member has or reasonably should have knowledge of such criminal activities, except where specifically directed and authorized by the CCSO." (Dkt. # 19-3, § VI(E)(39)).

- "[Conduct which may result in discipline includes but is not limited to the following:] other on- or off-duty conduct which a member knows or reasonably should know is unbecoming a member of the CCSO; which is contrary to good order, efficiency or morale; or which tends to reflect unfavorably upon the CCSO or its members." (Dkt. # 19-3, § VI(E)(43)).

- "Employees will comply with lawful departmental rules, written procedures directives, bulletins, and verbal orders issued by the proper authorities." (Dkt. # 19-4, § III(A)(4)).

- "No employee will frequent any establishment or knowingly associate with persons having known criminal records that would bring discredit to the department, except when properly authorized to do so." (Dkt. # 19-4, § III(B)(18)).

- "Employees will maintain professional demeanor while on duty and will refrain from engaging in off-duty behavior that would reflect negatively on the department." (Dkt. # 19-4, § III(D)(6)).

These policies are facially neutral, as they apply equally to all officers employed by the Sheriff's Office. Furthermore, the policies serve legitimate and compelling public safety interests. The Sheriff's Office has a legitimate interest in regulating the

9

behavior of its sworn officers to minimize conflicts of interest and protect the credibility and integrity of the Sheriff's Office. Defendants' Motion to Dismiss is granted as to Count II.

## II. The Merit Board Defendants' Motion to Dismiss

The Merit Board moves to dismiss Counts II through IV against it because it is not Rice's employer. Because the Court dismisses Count II above, it need not address the Merit Board's argument as to Count II. As for Counts III and IV, in order for Rice to bring a Title VII claim against the Merit Board, he must establish the Merit Board was his employer. As the Seventh Circuit and other courts in this District have recognized, however, the Merit Board does not act as an employer, but instead acts as an agent of the Cook County Sheriff's Office, which delegates certain employment functions to it. *See Averhart v. Cook Cnty. Sheriff*, 752 F.3d 1104, 1106 (7th Cir. 2014) (concluding that the Merit Board was not an employer when acting in its capacity adjudicating proposed terminations); *Coleman v. Sheriff of Cook Cnty.*, 2018 WL 3740558, at *5 (N.D. Ill. 2018) (Durkin, J.) (recognizing that the Merit Board acts as the Sheriff's agent for purposes of Title VII liability). Accordingly, the Merit Board cannot be properly sued directly as an employer under Title VII. *Simpson v. Cook Cnty. Sheriff's Off.*, 2019 WL 3733758, at * 2 (N.D. Ill. 2019). Counts III and IV are dismissed as to the Merit Board.

## **CONCLUSION**

For the reasons stated above, the Court grants Defendants' Motions to Dismiss [18, 20]. Count II is dismissed, the allegations of national origin discrimination are stricken, and Counts III and IV are dismissed as to the Merit Board only. Status hearing is set for May 5, 2022 at 10:10 a.m. It is so ordered.

Dated: April 7, 2022

_____
Charles P. Kocoras
United States District Judge