UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCOTT RICE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 21 C 5524 |
| ) | |
| THOMAS J. DART, in his official capacity ) | |
| as Sheriff of Cook County, Illinois; THE ) | |
| COOK COUNTY SHERIFF'S MERIT ) | |
| BOARD; and COOK COUNTY, ILLINOIS, ) | |
| as indemnitor, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Plaintiff Scott Rice seeks review of the decision of Defendant Cook County Sheriff's Merit Board ("Board" or "Merit Board") terminating his employment as a corrections officer with the Cook County Department of Corrections ("CCDOC").[1] Rice argues the Board's factual findings are against the manifest weight of the evidence and there was not just cause for his termination. For the reasons set forth below, the Court affirms the Board's termination decision.

---

[1] This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331. Supplemental jurisdiction applies to the state law administrative-review claim. *McRay v. Ross*, 2018 WL 2432164, at *1 n.1 (N.D. Ill. 2018) (citing 28 U.S.C. § 1367).

**BACKGROUND**

The record reveals the following facts and procedural history.

I.     **Procedural Background**

Rice is a former corrections officer with the CCDOC.  On January 24, 2017, the Sheriff filed its first disciplinary complaint before the Merit Board against Rice.  The complaint alleged that Rice had multiple associations with "persons, whom he knew, or should have known were felons and/or affiliated with a known criminal organization ('gang')" which he failed to report to the Cook County Sherriff's Office ("CCSO"). Amended complaints were filed on January 23, 2018, and May 21, 2019 (collectively, the "1966 Complaints").  The 1966 Complaints identify multiple incidents where Rice was allegedly involved in such activity.

The first listed incident occurred on November 22, 2013, when Dante Mason, an incarcerated individual and gang member, called Rice's personal cell phone.  Rice did not answer the call.  The second incident occurred on March 19, 2014, when the Chicago Police Department ("CPD") pulled over a vehicle in which Rice was a passenger.  Also in the vehicle was Ronald Webb, a convicted felon and gang member. The third incident occurred on March 3, 2012, when, during an encounter with the police, Rice identified himself as a Sheriff's Office employee while in the company of several self-admitted street gang members.

On May 2, 2018, the Sheriff filed another complaint against Rice, alleging more incidents of unreported dealings with persons whom Rice allegedly knew or should

have known were persons under criminal investigations or indictment, and/or who have a reputation for criminal behavior. An amended complaint was filed on May 21, 2019 (collectively, the "2106 Complaints"). The 2106 Complaints identify multiple occasions over the course of approximately four months in 2017 where Rice is pictured on his and others' social media accounts (i.e., Instagram) associating with Webb, a convicted felon and self-admitted gang member, and Michael Hopkins and Brandon Armour, convicted felons.

On November 19, 2020, the Merit Board held a hearing for Rice's combined cases.[2] Based on the hearing and the record, on March 4, 2021, the Merit Board found that Rice violated "the General Orders and Policies of the Cook County Sheriff's Department, and the Rules and Regulations of the Cook County Sheriff's Merit Board and that [Rice] should be terminated effective January 24, 2017." Dkt. # 54, at 139–43. In its Decision, the Merit Board detailed the basis for its findings:

> Based on the evidence presented and the testimony of the respondent, Scoot Rice [*sic*], violated the Sheriff's policy by direct evidence from the Chicago Police Department's contact cards and by admission of the Respondent. These admissions are also documented in the Respondent's Finding of Fact documentation. The Sheriff did prove the on-going contact and association with self-identified gang members and convicted felons. The testimony of the respondent that he was unaware of his friend's criminal activity is not credible. It is not credible that a law enforcement, Sheriff's Correctional Officer, who grew up in the same neighborhood, would not know his friend's involvement in criminal activity. He may not have known the details of every criminal act but he should have known, that as a Cook County Correctional Officer, it is

---

[2] Docket Nos. 1966 and 2106 were consolidated based on their similar charges; however, the Sheriff requested that the Merit Board enter separate findings of termination for each case, given the different incidents involved.

3

against every aspect of law enforcement for an officer to be in an ongoing association with gang members and felons.

*Id.* at 141–42.

## II. Testimony Before the Merit Board

At the hearing, the Merit Board heard testimony from Director Juan Diaz, the Office of Professional Regulation ("OPR") Investigator for the incidents described in the 1966 Complaints, Esther Montanez, the OPR investigator for the 2106 Complaints, and Rice.

### *Juan Diaz*

Diaz explained that he was assigned to investigate Rice because Rice was "caught by the Chicago Police Department associating with individuals associated with several gang members in a vehicle" in 2014. Diaz explained how he reviewed Rice's CPD contact card, which provided contact information related to "who was there, whom was stopped, and the reason for the contact" during a vehicle stop. One of the individuals Diaz identified in the vehicle with Rice was Webb. Diaz went on to obtain the criminal history and gang affiliations records for Webb. No arrests were made or tickets issued as a result of the stop.

In addition to the Webb incident, Diaz learned from CPD contact cards that Rice had been stopped by the CPD seven times, including when Rice was arrested in August 2013 and charged with reckless conduct at a nightclub.

Diaz testified that his investigation revealed a November 22, 2013 phone call to Rice's personal telephone from Dante Mason, an incarcerated individual whom Rice

4

had known for over ten years. While Diaz did not know whether Rice and Mason spoke that day (or at any point during Mason's incarceration), Diaz listened to Mason's calls and discovered that, when Mason was unable to reach Rice, Mason made a second call to another individual and instructed him to call Rice and tell Rice to contribute to Mason's bond money. Diaz considered this information as "confirming, for example, the association of individuals that he was hanging out into the streets, it was showing that he was associating himself with individuals that are incarcerated as well." *Id.* at 332. There is no evidence that Rice ever provided financial assistance to or spoke with Mason.

In December 2014, Diaz interviewed Rice. During the interview, Rice was asked about his contact card entries and the criminal records of Mason and Webb. Rice reportedly answered that "being stopped with those individuals was not uncommon based on the fact that he grew up with those guys, they were friends of his from the neighborhood." *Id.* at 341–42. Rice also remarked that "while it may be true" that Webb and Mason may be listed as gang members or they may have extensive criminal backgrounds, "he's not a gangbanger and hasn't been arrested." *Id.* at 343, 641.

Diaz testified that a "criminal history" is not a "criminal conviction," and that at the time of the 2014 interview, Rice stated he was unaware whether Webb had ever been convicted of a crime, and that he was "unaware of Ronald Webb's arrest history." *Id.* at 363, 365–66. According to Diaz's interview report, at the end of the interview,

5

"Rice admitted that he has to be more cognizant of the individuals he is associating with." *Id.* at 642.

In 2017, Diaz participated in Investigator Montanez's interview with Rice. Diaz testified that Rice first claimed he "didn't know" about Webb's criminal history. Diaz stated that when he reminded Rice about his 2014 interview when they discussed the same subject matter, "once again [Rice] just brushed it off as a lapse in poor judgment on his part." *Id.* at 344. When asked about Webb, Mason, Hopkins, and Armour, Rice admitted that "those are individuals he grew up with, they are from the neighborhood that he grew up in, and that he still sees them from time to time." *Id.* at 373.

**Esther Montanez**

Montanez, the OPR Investigator who reviewed the incidents alleged in the 2106 Complaints, also testified. Montanez became involved after the CPD investigated a gang shooting and found photos of CCSO employees, including Rice, on the Instagram profiles of the individuals they were investigating.

Montanez identified Rice interacting with Webb, Hopkins, or Armour in multiple photographs obtained from Instagram. Three of the photographs were posted on Rice's Instagram account. The first depicts Rice and Webb, and Webb commented on the photo using his own Instagram account. The second and third photos show Rice and Hopkins, and Rice, Webb, and a third individual. In the second photo, Hopkins's

6

Instagram account is tagged in the description along with "#maydeen"[3]. In the caption of the third photo, Rice included the hashtag "#...me an my bros…"

The fourth photo was posted to Armour's Instagram account and shows Rice with Armour and another individual. Rice "liked" the photo. Rice was also tagged in three photographs posted to Hopkins's account. Those photographs show Rice with two other individuals, Rice, Webb, and Hopkins, and Rice and Hopkins. Rice "liked" photos and commented on one of them.

When asked about the photographs, Rice would frequently indicate that "it was just a photo" that he took or was taken of him. Montanez stated that, on one occasion, Rice noted that the photos were of him out "with his friends, he said they were brothers." *Id.* at 270.

According to Montanez, when asked about Webb, Hopkins, and Armour, Rice stated that "they were childhood friends" and that he "grew up in the Englewood area, he's from a neighborhood where there are gangs, and he said that he does know individuals that have been arrested." *Id.* at 290. Rice purportedly said "something about . . . basically still being friends with some of them even though they had a past history" but did not see anything wrong with that. *Id.* at 291. Montanez further testified

---

[3] Montanez described how she had asked Rice—after his OPR interview—about the term "MayDeen". In response (while not under oath) Rice referred to a t-shirt business with some of the individuals and Montanez understood those "individuals" to mean Hopkins, Webb, and Armour. There is no evidence of Rice's actual involvement in the business. Diaz also testified that at the conclusion of the 2017 interview, Rice made a comment that he, Webb, Armour, and Hopkins had "some clothing business or some – some T-shirt making business together." Dkt. # 54, at 344–45. Diaz understood the comment to mean that Rice's association with those individuals was based on a business partnership.

7

that at no time did Rice ever admit to "regularly hanging out" with these individuals, and she could not recall if she asked Rice about how frequently he interacted with these three individuals either.

During her testimony, Montanez noted that the case for Rice's violations of CCSO Policy by "continuing association" with Webb was clear. Rice agreed that he knew that Webb had been convicted of a felony and that Rice had been confronted with the information by Diaz during the 2014 investigation involving Rice's vehicle incident with Webb. Regarding additional violations, Montanez explained how Rice's failure to complete the Known Criminal Organizations Disclosure "that is sent out via email and also by not disclosing that he was associated to those individuals including Webb" was another violation of policy. *Id.* at 312.

### Scott Rice

Rice testified that he grew up in Englewood and resided on Aberdeen Street for most of his life until he moved in 2015. Rice's grandparents still live in Englewood, and Rice visits the neighborhood at least every two weeks. When asked about contacts with Hopkins, Armour, and Webb, Rice testified that he knew them from the neighborhood but that he did not regularly socialize with them in 2017. While he referred to them as his "bros," that was "a term he used forever" with them. *Id.* at 388–89. Rice said that in 2017 when the photos in question were posted on Instagram, he did not have any firsthand knowledge that Webb, Hopkins, or Armour had ever been convicted of any felonies or had been arrested before. Rice also stated that he

8

had no way to access criminal records to find out that information.

When Rice was asked for the reason why he was stopped in a car with Webb in 2014, Rice stated that he had "no clue" and there were "no tickets issued, no arrests, nothing." *Id.* at 379. Rice could not recall the reason he was in the car with Webb in the first place.

When questioned about Mason, Rice stated that he knew Mason from the neighborhood and from a previous job but had no knowledge that Mason had attempted to contact him from jail, and he does not "pick up foreign numbers." *Id.* at 381. Rice testified that he never talked to Mason while he was in custody in 2014.

Rice was further questioned about the term "MayDeen" and testified that "MayDeen Denim" is a clothing line that Hopkins owns. Rice explained the name "MayDeen" was a combination of two blocks in the Englewood area, Aberdeen and May. Rice stated he had purchased clothing from the MayDeen brand but does not participate in any of the business operations, invest any money, or promote the brand other than wearing it. Rice also testified that neither of the OPR investigators questioned him about "MayDeen".

## **STANDARD OF REVIEW**

The Illinois Administrative Review Law provides for judicial review of administrative agency decisions. 735 ILCS 5/3-110. Factual findings are presumed "to be prima facie true and correct," *id.*; *Richard's Tire Co. v. Zehnder*, 295 Ill. App. 3d 48, 56 (1998), which means that the findings remain intact unless they are against the

9

manifest weight of the evidence, *Roman v. Cook Cnty. Sheriff's Merit Bd.*, 2014 IL App (1st) 123308, ¶ 67. The manifest-weight standard is not satisfied "merely because an opposite conclusion might be reasonable." *Id.*; *see also id.* (a factual finding will be reversed "only if, after viewing the evidence in the light most favorable to the agency, [the reviewing court] conclude[s] that no rational trier of fact could have agreed with the agency's decision and an opposite conclusion is clearly evident"). But even under the manifest weight standard, the deference given to the agency's decisions is not "boundless." *Kouzoukas v. Ret. Bd. of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 465 (2009) (quoting *Wade v. City of N. Chi. Police Pension Bd.*, 226 Ill. 2d 485, 507 (2007)). The review "cannot amount to a rubber stamp of the proceedings below." *Bowlin v. Murphysboro Firefighters Pension Bd. of Trs.*, 368 Ill. App. 3d 205, 211–12 (2006). Although a decision may be "supported by some evidence, which if undisputed would sustain the administrative finding, it is not sufficient if upon a consideration of all the evidence, the finding is against the manifest weight." *Id.* A reviewing court should not "hesitate to grant relief" when a record lacks the "evidentiary support for the agency's determination." *Id.*

## DISCUSSION

Judicial review of an administrative decision to discharge an employee requires a two-step approach. *Walsh v. Bd. of Fire & Police Comm'rs*, 96 Ill. 2d 101, 105 (1983). The first issue before the Court is whether the Board's factual findings are against the manifest weight of the evidence. *Id.* According to Rice, the "central problem" with the

Board's decision is it disregards the fact that there is no evidence Rice was aware of any criminal backgrounds or gang affiliations of Hopkins, Webb, and Armour, or that he had "regular or continuous" association with such individuals. In the Court's view, much of Rice's argument goes to his credibility as a witness.

"[A]s a reviewing court, we may not reweigh the Merit Board's determination as to the evidence or the credibility of witnesses." *Lopez v. Dart*, 2018 IL App (1st) 170733, ¶ 82. "Conflicts in testimony revolve around the credibility of the witnesses and are to be resolved by the agency who heard the evidence and observed the witnesses." *Id.* (quoting *Keen v. Police Bd.*, 73 Ill. App. 3d 65, 71 (1979)).

Rice complains that "[i]t would be helpful if in the Board's reasoning it explained how the Sheriff 'did prove the on-going contact and association with self-identified gang members and convicted felons,' but it provides no more fulsome explanation about this." Dkt. # 45, at 13. The Court agrees the Board could have gone into greater detail as to the reasons for its conclusions, but it did indicate that the decision was based on the CPD contact cards and Rice's own admissions. The Board further explained that Rice's testimony that he "was unaware of his friend's criminal activity" was not credible.

Rice argues the CPD contact cards provide no information as to the nature of the stop leading up to the contact card, and that the cards themselves are hearsay. The Sheriff replies that the cards are not inadmissible hearsay because they were not presented for the truth of the matters asserted, but rather to show how Diaz conducted

11


his investigation and what information he relied on to come to his conclusions that policies were violated. Even assuming the contact cards are hearsay, as detailed above, the cards were not the only evidence presented against Rice.

The Instagram photos and interactions between Rice, Hopkins, Armour, and Webb over the course of several months in 2017 suggest far more contact than Rice admitted to. Additionally, Rice was informed of Webb's background and conviction in 2014, yet continued to associate with him in 2017, and never completed a Known Criminal Organization Disclosure Form.

The Court concludes that the record contains evidence to support the Board's determination that Rice violated internal rules, regulations, and orders related to ongoing contact with individuals whom Rice knew, or should have known, were gang members and convicted felons. Again, an administrative agency decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident." *Vill. of Buffalo Grove v. Bd. of Trs. of Buffalo Grove Firefighters' Pension Fund*, 2020 IL App (2d) 190171, ¶ 38 (cleaned up). We do not find that to be the case here.

The second step in the Court's analysis is to determine whether the Board's factual findings provide a sufficient basis for its conclusion that cause for discharge exists. *Walker v. Dart*, 2015 IL App (1st) 140087, ¶ 39. Cause is defined as "some substantial shortcoming that renders the employee's continued employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his no longer occupying

the place." *Lopez*, 2018 IL App (1st) 170733, ¶ 75 (citing *Walsh*, 96 Ill. 2d at 105). "Because the Board, and not this court, is in the best position to determine the effect of the employee's conduct on the agency, we accord considerable deference to the agency's discharge decision." *Rios v. Cook Cnty. Sheriff's Merit Bd.*, 2020 IL App (1st) 191399, ¶ 33. There must be some competent evidence to support the Merit Board's decision, *Magett v. Cook Cnty. Sheriff's Merit Bd.*, 282 Ill. App. 3d 282, 287 (1996), and even a single violation can justify termination, *Cruz v. Dart*, 2019 IL App (1st) 170915, ¶ 59.

Rice complains that the Board never explained why termination was necessary, or why a lesser sanction such as a suspension or warning could not correct the issues complained of. However, the question "is not whether this court would decide upon a more lenient sanction than discharge," but instead whether the Board "acted unreasonably or arbitrarily or selected a type of discipline unrelated to the needs of the service." *Sutton v. Civil Serv. Comm'n*, 91 Ill. 2d 404, 411 (1982). And "as long as evidence supports the decision, the Board need not explain itself." *Cintron v. Dart*, 2022 IL App (1st) 201369, ¶ 28 (citing *Rios*, 2020 IL App (1st) 191399, ¶ 29).

The Sheriff's Office argues it and the Merit Board have "a legitimate interest in ensuring that all law enforcement officers, including correctional officers, maintain integrity, abide by the law, and avoid conduct which reflects negatively on the officer or the Sheriff." Dkt. # 48, at 15. The Court agrees. "The job of a police officer requires the utmost integrity and honesty." *Rios*, 2020 IL App (1st) 191399, ¶ 34. "[D]ischarge

is an appropriate sanction when a police officer's misconduct manifests a disrespect for the law and tends to undermine public confidence in the honesty and integrity of the police force." *Caliendo v. Martin*, 250 Ill. App. 3d 409, 418 (1st Dist. 1993); *see also Vill. of Oak Lawn v. Hum. Rts. Comm'n*, 133 Ill. App. 3d 221, 224 (1985) ("[t]rustworthiness, reliability, good judgment, and integrity are all material qualifications for any job, particularly one as a police officer.")

In this case, the Merit Board based its termination on Rice's admitted interactions with individuals whom, in the Board's view, he knew or should have known were convicted felons and gang members. The Board did not find Rice's testimony that he did not know of his friends' criminal activity credible. The Board noted that "it is against every aspect of law enforcement for an officer to be in an ongoing association with gang members and felons." Dkt. # 54, at 247–48. We find these facts provide sufficient cause for the Board's termination decision, and therefore the decision was not arbitrary or capricious. The Board's decision is affirmed.

## CONCLUSION

For the foregoing reasons, the Court affirms the Merit Board's decision terminating Rice from his employment with the CCDOC. Telephonic status hearing is set for October 31, 2023 at 10:20 a.m. It is so ordered.

Dated: September 26, 2023

                                            *Charles P. Kocoras*
                                            Charles P. Kocoras
                                            United States District Judge